**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GEODECISIONS, a division of** | : | **No. 1:10-CV-2180** |
| **GANNETT FLEMING, INC.,** | : | |
| **Plaintiff,** | : | **(Chief Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | |
| **DATA TRANSFER SOLUTIONS, LLC,** | : | |
| **d/b/a DTS,** | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

On October 22, 2010, Plaintiff GeoDecisions ("GeoDecisions") filed this action alleging

breach of contract and requested injunctive relief. (Doc. No. 3.) Plaintiff alleged that Defendant

had extended offers of employment to twelve of its employees in clear violation of a valid non-

solicitation agreement between the parties. (<u>Id.</u>) On Plaintiff's motion, the Court entered a

Temporary Restraining Order on October 22, 2010, enjoining and restraining Defendant Data

Transfer Solutions ("DTS") from employing any person employed by GeoDecisions since May

28, 2010. (Doc. No. 6.) On October 26, 2010, DTS moved to dismiss for lack of jurisdiction.

(Doc. No. 11.) The Court authorized discovery on the jurisdictional issue and dissolved the

Temporary Restraining Order, pending a determination of jurisdiction. (Doc. No. 18.) On

November 15, 2010, the Court denied DTS's motion to dismiss for lack of jurisdiction and

reinstated the Temporary Restraining Order. (Doc. No. 27.) Following briefing by the parties,

on November 29, 2010, the Court held a hearing on GeoDecisions's motion for preliminary

injunction. For the reasons stated herein, the Court will grant the motion.

**I. BACKGROUND**

GeoDecisions is a division of Gannett Fleming, Inc., a Delaware corporation, and has its

principal place of business in Camp Hill, Pennsylvania.  (Doc. No. 1 ¶ 1.)  DTS is a Florida

corporation and has its principal place of business in Orlando, Florida.  (Id. ¶ 2.)  Both

companies are direct competitors in the information technology field and have historically

competed for projects throughout the United States.  (Id. ¶ 13.)

    Kevin Switala is employed by GeoDecisions and works in Philadelphia, Pennsylvania.

(Hearing Tr. at 24:15.)  In April 2010, Switala attended an industry meeting in California where

he met David Buckley, a DTS Vice President.  (Plaintiff Exhibit 2.)  On April 27, 2010, Switala

received an email in which Buckley proposed that DTS and GeoDecisions "consider teaming" on

a project in California known as "SD REGIN."  (Id.)  On May 28, 2010, Buckley, Switala, and

Allen Ibaugh, CEO of DTS, spoke on a conference call regarding the SD REGIN project as well

as "other possible teaming opportunities, beyond the immediate SD REGIN."  (Plaintiff's

Exhibit 3.)  Later on May 28, 2010, Switala emailed a Mutual Nondisclosure Agreement

("Agreement") to Buckley and Ibaugh.  (Id.)  Switala requested that they review the document

"and if acceptable, sign and email it back to me so I can do the same on my side."  (Id.)  Switala

further advised that they were welcome to suggest alternative terms.  (Id.)  Trey Fragala, COO of

DTS, reviewed and signed the document on behalf of DTS, and on June 10, 2010, Switala

forwarded a fully executed version of the Agreement to DTS.  (Plaintiff's Exhibit 5.)  According

to Switala, he did not engage in any further substantive discussions with DTS regarding the SD

REGIN or other projects following mid-July 2010.  (Hearing Tr. at 47:9-14.)

    The Agreement, which is the subject of the present action, has been signed by

representatives of DTS and GeoDecisions.  (Plaintiff Exhibit 6.)  It was effective as of May 28,

2010, and is largely concerned with protecting confidential information that may be disclosed

"[d]uring the course of discussions between the parties relating to and for the purpose of developing a mutually beneficial business relationship."  (Id.)  Of particular note, Paragraph 16 of the Agreement states in full:

> For a period of two (2) years from the date of this Agreement, neither party shall solicit for employment or employ any person employed by the other party, or otherwise encourage any person to terminate employment with such party.

(Id.)  The Agreement contains no further limitations of any kind on the scope of the "no-hire" provision and purports to be the "complete and exclusive statement of the agreement between the parties."  (Id.)

In mid-October 2010, DTS extended offers of employment to twelve GeoDecisions employees: Connie Gurchiek, Jesse Jay, Rodney Bunner, Steven Korzekwa, William Schuman, Ryan Reich, Fred Riethmiller, Kristine Barry, Jeff Bible, Chris Grubb, Deepa Kini, and Don Kiel.  (Hearing Tr. at 52:3-7.)  DTS was aware that these individuals were employed by GeoDecisions when it extended the employment offers.  (Id. at 52:8-10.)  Most of the individuals resigned their positions at GeoDecisions in mid-October 2010.  (Id. at 89:17-21.)  Specifically, Connie Gurchiek resigned her position at GeoDecisions on October 14, 2010, and Jesse Jay resigned from GeoDecisions on October 15, 2010.  (Id. at 76:19-23; 84:16-17.)  DTS has also extended an offer to Mike Wiley, another GeoDecisions employee.  (Id. at 52:17-20.)  At the hearing, Anthony Pietropola, President of GeoDecisions, admitted that he was aware that Connie Gurchiek was going to work for DTS and that he did not mention the Agreement to her.  (Id. at 100:23-25; 101:1-4, 19-22.)  Pietropola further stated that he did not have a conversation regarding the Agreement with any of the departing employees.  (Id. at 101:23-25.)

GeoDecisions's General Counsel Barbara McLemore sent a letter dated October 18,

2010, to Mr. Ibaugh and noted that DTS had extended employment offers to several of

GeoDecisions's employees. (Defendant's Exhibit 8.) In the letter, McLemore advised Ibaugh

that GeoDecisions would be monitoring DTS's future activities to ensure protection of its

interests. (Id.) However, the letter did not make note of the Agreement.

At the hearing the parties stipulated that:

> [T]he plaintiff is not relying on the allegations in the complaint or the
> affidavit of Tony Pietropola regarding, one, the alleged sabotage of
> the Texas DOT tracks project by former GeoDecision employees
> Gurchiek and Jay, the alleged downloading or e-mailing by former
> GeoDecision employees of confidential business information of
> GeoDecisions, the alleged loss of potential customers to DTS due to
> DTS's alleged acquisition of GeoDecisions's confidential
> information from the individual employees, the alleged use of
> GeoDecisions's business and customer records by the former
> GeoDecision employees to contact and solicit GeoDecisions
> customers for their benefit and the benefit of DTS, and the alleged
> misappropriation by DTS and the former GeoDecision employees
> and the alleged use of such information to compete with
> GeoDecisions.

(Hearing Tr. 133:1-14.)

## II.     STANDARD OF REVIEW

GeoDecisions's motion for a preliminary injunction is governed by Rule 65(a) of the

Federal Rules of Civil Procedure. An injunction is an "extraordinary remedy" that is never

awarded as of right. Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 375 (2008). "A

party seeking a preliminary injunction must satisfy the traditional four-factor test: (1) a

likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is

denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4)

the public interest favors such relief." Miller v. Mitchell, 598 F.3d 139, 147 (3d Cir. 2010)

(citing Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524

(3d Cir. 2004)).

## III.  DISCUSSION[1]

GeoDecisions asserts that it has satisfied the requirements for injunctive relief and that the no-hire provision should be upheld as a reasonable partial restraint on trade.  DTS counters that GeoDecisions fails to establish any of the four requirements for a preliminary injunction.  It argues GeoDecisions is unlikely to succeed on the merits because the no-hire provision is invalid and that the Agreement is void under the doctrine of frustration of purpose.  DTS further asserts that GeoDecisions has not suffered irreparable harm, that DTS and the employees at issue will be injured by a preliminary injunction, and that enforcing the no-hire provision is against public policy.

### A.      Likelihood of Success on the Merits

#### 1.      *Validity of the No-Hire Provision*

Initially, in addressing the likelihood of success on the merits the Court must consider the nature of the Agreement at issue here, specifically the no-hire provision.  GeoDecisions argues the contract is nothing more than a standard commercial agreement "involving, at most, a partial restraint of trade."  (Doc. No. 33 at 7.)  DTS counters that the Agreement is a restrictive covenant akin to an employee non-compete clause.  (Doc. No. 13 at 10-11.)  The parties have not identified any Pennsylvania cases squarely addressing a similar no-hire provision in an agreement between two corporations.  Other courts considering the issue have found that although such no-hire provisions do impact an employee's ability to obtain future employment,

---

[1] The Agreement provides that it will be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.  (Plaintiff's Exhibit 6.)  The parties do not contest this issue.

they are not properly characterized as covenants not to compete or restrictive covenants between employer and employee. See, e.g., Therapy Servs., Inc. v. Crystal City Nursing Ctr., Inc., 389 S.E.2d 710, 711-12 (Va. 1990). Rather, agreements containing such provisions are construed as contracts in restraint of trade. See, e.g., id.; H&M Commer. Driver Leasing, Inc. v. Fox Valley Containers, Inc., 805 N.E.2d 1177, 1184 (Ill. 2004).

The Court agrees with the reasoning of the Supreme Courts of Virginia and Illinois. The Agreement at issue here is between DTS and GeoDecisions. It provides for the mutual non-disclosure of confidential information in the context of the development of a business relationship. As a part of that Agreement the parties agree to refrain from hiring individuals who are not parties to the contract. The provision does not deprive DTS and GeoDecisions employees of the right to seek gainful employment in their chosen field or in their chosen geographic region. Rather, as emphasized repeatedly in the hearing, under the Agreement GeoDecisions's employees are free to leave their employer and seek employment at any potential competing firm with the sole exception of DTS. (E.g., Hearing Tr. at 121:11-14.) Likewise, under the Agreement, DTS's employees are free to leave for any firm with the sole exception of GeoDecisions. Such a negative promise limiting competition is by definition a restraint of trade. See, e.g., Restatement (Second) of Contracts § 186 (1981) ("A promise is in restraint of trade if its performance would limit competition in any business or restrict the promisor in the exercise of a gainful occupation.").

Restraints of trade are, as a general matter, void as against public policy. However, where restraints of trade are ancillary to certain legitimate transactions, the courts have upheld the agreements provided the restraints are reasonable. See generally Jacobson & Co., Inc. v.

6

Int'l Env't Corp., 235 A.2d 612, 617-21 (Pa. 1967) (analyzing a restraint of trade in an employment contract); Scobell Inc. v. Schade, 688 A.2d 715, 718 (Pa. Super. Ct. 1997) (contrasting the level of scrutiny applied to restraints of trade ancillary to employment contracts and sale of business agreements); Restatement (Second) of Contracts § 188 (1981) (promise in restraint of trade void if not reasonable and ancillary to an otherwise valid transaction).[2] Therefore, under Pennsylvania law, the no-hire provision must be rejected as void unless: (1) it is ancillary to the main purpose of a lawful transaction; (2) it is necessary to protect a party's legitimate interest; (3) it is supported by adequate consideration; and (4) it is reasonably limited in both time and territory. Volunteer Firemen's Ins. Serv., Inc. v. Cigna Prop. and Cas. Ins. Agency, 693 A.2d 1330, 1337 (Pa. Super. Ct. 1997). Defendant challenges the no-hire provision on each ground.

Under the common law adopted by Pennsylvania courts, "contracts in restraint of trade made independently of a sale of a business or contract of employment are void as against public policy regardless of the valuableness of the consideration exchanged." Jacobson, 235 A.2d at

---

[2] The traditional rule at common law is based on the "rule of reason":

> [W]e do not see how a better test can be applied to the question whether [this is a] reasonable [restraint of trade] or not, than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favour of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party [requires], can be of no benefit to either. It can only be oppressive. It is, in the eye of the law, unreasonable. Whatever is injurious to the interests of the public is void on the ground of public policy.

Compare Horner v. Graves, 7 Bing. 735, 743; 131 Eng. Rep. 284, 287 (C.P. 1831) (Chief Justice Tindal), with Restatement (Second) of Contracts § 188 (1981).

617 (citation omitted).  While the rule appears to strictly limit the types of agreements to which restraints of trade may be ancillary, in practice courts have construed this restriction somewhat liberally.  For example, the Supreme Court of Pennsylvania has upheld restraints of trade ancillary to sales of substantial equity interest or franchise rights.  <u>Piercing Pagoda, Inc. v. Hoffner</u>, 351 A.2d 207, 210-12 (Pa. 1976); <u>Ala. Binder and Chem.  Corp. v. PICCO</u>, 189 A.2d 180, 184 (Pa. 1963).  Moreover, the Pennsylvania Superior Court has held that restraints of trade could be enforced as ancillary to a sale of stock.  <u>Worldwide Auditing Servs., Inc. v. Richter</u>, 587 A.2d 772, 776 (Pa. Super. Ct. 1991).

Other jurisdictions considering the issue have similarly applied an expansive interpretation to the ancillary rule.[3]  The Restatement includes a non-exclusive list of possible transactions that would support an ancillary restraint of trade including a sale of business agreement, an employment agreement, and a partnership agreement.  Restatement (Second) of Contracts § 188 (1981).  Missouri has expanded on the Restatement's non-exclusive list to include partnership agreements, independent contractor agreements, and shareholder agreements. <u>Mayer Hoffman McCann, P.C. v. Barton</u>, 614 F.3d 893, 905-06 (8th Cir. 2010) (citing <u>Renal Treatment Centers-Mo., Inc. v. Braxton</u>, 945 S.W.2d 557, 563 (Mo. Ct. App. 1997)).  Plaintiff also cites a number of cases in which independent contractor agreements and similar relationships have been found to satisfy the ancillary rule.  <u>See generally</u> <u>Celtic Maint. Servs. v. Garrett Aviation Servs., LLC</u>, No. 106-177, 2007 U.S. Dist. LEXIS 93715 (S.D. Ga. Dec. 21,

---

[3] Although there has been some deviation, the Pennsylvania Supreme Court has recognized that the development of the Pennsylvania law governing restraints of trade has, in at least some respects, paralleled the development of the law in other jurisdictions.  <u>See</u> <u>Hess v. Gebhard & Co.</u>, 808 A.2d 912, 918 (Pa. 2002).  To that end, it is instructive to review how other states have interpreted the rule.

2007) (two-year maintenance agreement including a one-year no-hire clause subject to the written approval of the other party); <u>H&M Commercial Driver Leasing, Inc.</u>, 805 N.E.2d 1177 (agreement to provide truck drivers and related personnel in which defendant agreed to not hire any drivers or other personnel plaintiff furnished to defendant for one year subject to liquidated damages); <u>Therapy Servs.</u>, 389 S.E.2d 710 (agreement to provide health care workers to a nursing home for the duration of the contract period and for six months thereafter); <u>Club Props. v. Atlanta Offices-Perimeter</u>, 348 S.E.2d 919 (Ga. Ct. App. 1986) (lease and service agreement in which lessee agreed to pay a procurement fee if it hired anyone employed by lessor in the six months prior to the start of the individuals employment with lessee).

Perhaps most significantly, the Court observes that in articulating the ancillary rule, the Pennsylvania Supreme Court relied on the Sixth Circuit's opinion in <u>United States v. Addyston Pipe & Steel Co.</u>  See <u>Jacobson</u>, 235 A.2d at 617.  In <u>Addyston</u>, Judge Taft – future Chief Justice of the United States – rejected an interpretation of the ancillary rule that was limited to certain enumerated types of contracts.  <u>Addyston Pipe & Steel Co.</u>, 85 F. at 281-82.  Rather, relying on the cases upholding those types of agreements he explained that the purpose of the ancillary rule was to ensure that the restraint of trade was not the sole object of an agreement.  <u>Id.</u> at 282. Therefore, as Judge Taft explained, to satisfy the ancillary rule:

> [T]he contract must be one in which there is a main purpose, to which the covenant in restraint of trades is merely ancillary.  The covenant is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other.

<u>Id.</u>

Against this backdrop, the Court concludes the Agreement does satisfy Pennsylvania's

ancillary rule.  The parties agreed to enter into a business relationship related to teaming on at least one project.  This type of arrangement is akin to the agreement in Therapy Services where two corporations agreed to work together to serve a business end, in that case to provide therapeutic services, and agreed that in the course of the relationship they would not hire one another's employees.  389 S.E.2d 710.  Just as in Therapy Services the purpose of the Agreement was not to restrict a corporation's ability to hire a competitor's employees.  Rather, the purpose of the arrangement was to ensure a productive temporary cooperative relationship.

Next, Plaintiff must establish that the restriction is necessary to protect a party's legitimate interest.  The Third Circuit, when applying Pennsylvania law, has recognized that legitimate business interests include:  (1) trade secrets, (2) confidential information, (3) goodwill, (4) unique or extraordinary skills, and (5) specialized training that would benefit competitors.  Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 424 (3d Cir. 2010) (citation omitted); see also Thermo-Guard, Inc. v. Cochran, 596 A.2d 188, 193-94 (Pa. Super. Ct. 1991) ("Trade secrets of an employer, customer goodwill and specialized training and skills are all legitimate interests protectible through a general restrictive covenant.").  The Agreement, and the no-hire provision in particular, serves to protect both confidential information exchanged in the course of discussions regarding teaming and prevents the poaching of staff who possess DTS's and GeoDecisions's "know-how."  (Hearing Tr. at 31:17-24, 37:4-10.)  As the Virginia Supreme Court explained, corporations have a legitimate interest in ensuring that they are not treated as an "involuntary and unpaid employment agency" for competitors to whom they have exposed themselves and their personnel.  Therapy Servs., 389 S.E.2d at 711-12.  Here, GeoDecisions and DTS envisioned the possible partnership of at least one and possibly more projects in which the

parties would be sharing valuable institutional knowledge and would be working closely with

key personnel.  (E.g., Hearing Tr. 31:18-24; 139:6-11.)  Therefore, the Court finds both DTS and

GeoDecisions had a legitimate business interest in including the no-hire provision in the

Agreement.

Third, GeoDecisions must establish that the Agreement is supported by adequate

consideration.  At the preliminary injunction hearing DTS argued that the agreement was not

supported by adequate consideration because nothing was exchanged between the parties,

emphasizing that in the initial meeting, confidential information was not disclosed.  (Hearing Tr.

at 152:18-20.)  The Court finds this argument unavailing.  The Agreement is one creating

mutually binding obligations.  In re Estate of Ratony, 277 A.2d 791, 793 (Pa. 1971) ("It is a

general principle of law which has existed for centuries that mutual promises are binding upon

the parties thereto and furnish valid consideration.").  Both parties promised that as they engaged

in the development of "a mutually beneficial relationship" they would bind themselves by

limiting the use of any information obtained in the course of the discussions and by prohibiting

the hiring of one another's employees.  (Plaintiff's Exhibit 6.)  Because the promises themselves

are valid consideration, the Agreement cannot fail for want of consideration.

Finally, the no-hire provision will only be enforced if it is reasonably limited in both time

and territory.  In considering the reasonableness of the scope the no-hire provision, the Court is

mindful that "reasonableness in time or reasonableness in geographic extent are not separate

constellations" to whether the provision serves a legitimate business interest.  Vector Sec., Inc. v.

Stewart, 88 F. Supp. 2d 395, 400 (E.D. Pa. 2000) (quoting Alexander & Alexander, Inc. v.

Drayton, 378 F. Supp. 824, 831 (E.D. Pa. 1974)).  Rather, when weighing whether the scope of

the provision is appropriate, the Court must consider the nature of the interest being protected. Id. Finally, Pennsylvania Courts have held that "case law empowers Pennsylvania courts to grant partial enforcement of an overbroad covenant either by excising offensive portions of the covenant or by adding language." Bell Fuel Corp. v. Cattolico, 544 A.2d 450, 457 (Pa. Super. Ct. 1988); see also Hillard v. Medtronic, Inc., 910 F. Supp. 173, 177 (M.D. Pa. 1995).

The Agreement prohibits DTS and GeoDecisions from employing an employee of the other company for a term of two years. With the exception of the two year restriction there are no limitations on this prohibition. DTS argues that the provision, as written, is overbroad as the purpose of the Agreement was to foster cooperation on a California project. (Doc. No. 13 at 12.) DTS notes that the employees in question are based in Texas, Flordia, Iowa, Georgia, and Pennsylvania, and had no involvement with DTS on the project in question. (Id.) GeoDecisions does not dispute the location of the defecting employees, nor does it contend that these employees had any contact with DTS as a result of the relationship between DTS and GeoDecisions. Rather, GeoDecisions counters that the no-hire provision is reasonable because it is mutual, it only limits employees from seeking job opportunities at one company and as such geographic limits are not necessary, and the duration of the restriction is appropriate in light of the typical sales cycle of twelve to twenty-four months. (Doc. No. 33 at 13-14.)

The Court concludes that the restraint of trade entered here was not unreasonable. Unlike a restrictive covenant in an employment contract, the parties to this agreement are both sophisticated corporations. Therefore, the Court is confident that neither party suffered from an imbalance of knowledge or legal acumen when entering into the agreement. Further, this was not a "take-it-or-leave-it" transaction. Rather GeoDecisions explicitly invited DTS to negotiate

the terms of the agreement, which DTS declined to do.  (Plaintiff's Exhibit 3, 5.)  In light of the parties' equal bargaining positions, the Court will impose less searching scrutiny on the reasonableness of the restraint of trade than it would in the context of an employment contract. See Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 846 (Pa. 1957) (holding covenants ancillary to a sale of business receive less searching scrutiny than covenants ancillary to an employment contract because the hardship imposed on an individual is greater than the hardship on a corporation); Scobell Inc. v. Schade, 688 A.2d 715, 718 (Pa. Super. Ct. 1997).

Ultimately, the Court is unpersuaded that the scope of the Agreement is too broad.  See, e.g., H&M Commercial Driver Leasing, Inc., 805 N.E.2d at 1184; Therapy Servs., Inc., 389 S.E.2d at 712.  The agreement is quite limited as to the parties here.  The Agreement only prohibits the hiring individuals of one corporation.  Neither party has put forward convincing evidence that the inability to hire the other's employees has impaired its ability to fill open positions.  GeoDecisions has ably explained a two-year limitation is necessary in light of the twelve to twenty-four month sales cycle and is necessarily national because the parties are national corporations considering diverse teaming opportunities.  (Hearing Tr. 36:22-25; 37:1-21.)  In addition, it cannot be said that the provision interferes with the right of the parties' employees from seeking work, as they are only prohibited from being employed by one firm. (Plaintiff's Exhibit 6.)  While it might be argued that a more limited no hire provision such as one restricted to the GeoDecisions employees who worked on the SD REGIN project could have provided adequate protection to GeoDecisions and DTS, such speculation does not render the Agreement unreasonable.  Where the parties are both sophisticated and in equal bargaining positions, where the provision is clear and mutually binding, and where the provision does not

impose an overly broad restraint, the Court is unwilling to declare the provision unreasonable because one party determines ex ante that the bargain struck was not desirable. Therefore, the Court concludes that GeoDecisions has demonstrated a likelihood of success on the merits in that it has demonstrated a clear breach of a valid and enforceable agreement.

2.     *Frustration of Purpose*

DTS has also challenged GeoDecisions's likelihood of success on the merits by arguing that the Agreement was dissolved under the doctrine of frustration of purpose. "When people enter into a contract which is dependent for the possibility of its performance on the continual availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved." Hart v. Arnold, 884 A.2d 316, 335 (Pa. Super. Ct. 2005) (citation omitted). In explaining this doctrine, Pennsylvania courts have cited the Restatement of Contracts, which provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261 (1981); see also Ragnar Benson, Inc. v. Hempfield Twp. Mun. Auth., 916 A.2d 1183, 1189-90 (Pa. Super. Ct. 2007).

DTS avers that "[t]he sole purpose of the Agreement was to govern an exchange of confidential information between [GeoDecisions] and DTS should the [San Diego, California] project RFP come to fruition." (Doc. No. 13 at 9.) The California project RFP never came to fruition – and the parties did not exchange confidential information between them. (Id.) Thus, DTS argues, the Agreement "must, by law, be dissolved." (Id.) DTS's statement that the

Agreement was entered into for the sole purpose of exchanging information on the California project RFP is not supported within the four corners of the Agreement. The Agreement states that "[d]uring the course of discussions between the parties relating to and for the purpose of developing a mutually beneficial business relationship, each party may disclose to the other information it considers proprietary and confidential." (Plaintiff's Exhibit 6.) Thus, the contemplated purpose of the agreement was that discussions would occur aimed at "developing a mutually beneficial business relationship." (Id.) This broader purpose was not frustrated by the fact the parties did not submit a proposal to the California project or had yet to exchange confidential information.

The Court agrees with GeoDecisions that DTS's attempt to offer evidence of its own unilateral intent contravenes the parol evidence rule. Pennsylvania law provides that "when parties to a contract have reduced their agreement to writing, that writing will be the sole evidence of their agreement, and parol evidence may not be admitted to vary the terms of the contract in the absence of fraud, accident or mistake." Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 994 (3d Cir. 1987.) Paragraph 11 of the Agreement contains an integration clause which states:

> The parties agree that this Agreement is the complete and exclusive statement of the agreement between the parties relating to the subject matter of this Agreement. This Agreement supersedes all requests for proposals, proposals or other prior agreements, oral or written, and all other communications between the parties relating to the subject matter hereof.

(Plaintiff's Exhibit 6.) The presence of an integration clause within an agreement "make[s] the parol evidence rule particularly applicable." McGuire v. Schneider, Inc., 534 A.2d 115, 117 (Pa. Super. Ct. 1987). The Pennsylvania Supreme Court has stated that "[a]n integration clause

which states that a writing is meant to represent the parties' entire agreement is . . . a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d 425, 436 (Pa. 2004). Here, DTS executed the Agreement and noted that it had "no issues" with its terms. (Plaintiff's Exhibit 5.) The Agreement is fully integrated and represents the entire contract between the parties, and evidence of DTS's intent would vary the terms of the unambiguous contract. Therefore, the parol evidence rule bars the Court from considering DTS's proffered evidence of its intent.[4] <u>See</u> <u>Ragnar Benson, Inc.</u>, 916 A.2d at 1190. Ultimately the Agreement's broad purpose of facilitating discussions aimed at "developing a mutually beneficial business relationship" was not frustrated by the fact the parties did not submit a proposal to the California project. The Agreement was prospective in nature. (Planintiff's Exhibit 6.) It ensured that the parties could potentially work together on projects over the course of the next two years, and it was not a dead letter because the parties' plans for the SD REGIN project had not come to fruition. (<u>E.g.</u>, Hearing Tr. 49:4-18.) Therefore, the

---

[4] The Court notes that even if it were to consider evidence of DTS's intent, the evidence suggests that both parties intended a business relationship that would extend beyond the California project. An e-mail from DTS' Vice President David Buckley, sent to GeoDecisions on the date that the Agreement was prepared, states: "We appreciate your honesty and willingness to consider other possible teaming opportunities, beyond the immediate SD REGIN." (Plaintiff's Exhibit 3.) Moreover, the form on which this Agreement was based includes a second paragraph, which states in full: "If this Agreement relates to just one project, add project specific details here as to limit the use of this Non-Disclosure." (Plaintiff's Exhibit 4.) As Mr. Switala testified, "Our standard operating procedure dictates that if [the Agreement is] for a project, I actually replace the bolded text with the details and the name of the specific project. If under my intention it is for a global agreement, then I would delete that clause." (Hearing Tr. 33:6-14.) Mr. Switala's affirmative decision to delete this paragraph from the Agreement indicates the Agreement was intended to extend beyond the SD REGIN project. Thus, even if the Court considered DTS's intent, the Agreement would not be dissolved under the frustration of purpose doctrine.

doctrine of frustration of purpose will not serve to undermine GeoDecisions's likelihood of success on the merits

**B.     Irreparable Harm to Plaintiff**

The next factor in the Court's analysis is whether GeoDecisions will suffer irreparable harm if a preliminary injunction does not issue.  See Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 118 (3d Cir. 2010).  "Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it."  Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998) (citation and internal quotation marks omitted).  "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." Id. (noting that in the context of a trademark infringement claim, a party can demonstrate irreparable injury "in the forms of loss of control of reputation and the inevitable likelihood of confusion to consumers"); see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 595-96 (3d Cir. 2002) (stating irreparable harm may result from plaintiff's loss of market share); Nat'l Bus. Servs., Inc. v. Wright, 2 F. Supp. 2d 701, 709 (E.D.Pa. 1998) (finding irreparable harm in the form of loss of goodwill where an employee with extensive customer relationships developed at the plaintiff's corporation sought to begin working for a direct competitor).

GeoDecisions asserts that the employees at issue are "critical personnel" who have "extensive knowledge of confidential business, sales, and technical information."  (Doc. No. 14 at 19.)  For purposes of its motion, GeoDecisions has stipulated that the loss of confidential information possessed by any of its employees is not the basis of harm for injunctive relief. Instead, according to the testimony of GeoDecisions President Tony Pietropola, GeoDecisions's

17

injury will be the loss of the company's goodwill:

> The first harm right now is the goodwill to our clients. I mean, we're struggling right now to meet with all our clients. They don't understand what's going on. We're trying to explain to them and trying to support the clients that we can. That's a massive effort. I don't know how you – you cannot put a value on that effort. Some cases I think we've been able to secure those clients. Other ones . . . could be in jeopardy.

(Hearing Tr. at 92:21-25, 93:1-2.) Mr. Pietropola testified that the employees at issue had developed an "inside track of all new work" with GeoDecisions's clients, and therefore the employees' absence from the company would put GeoDecisions at a competitive disadvantage.[5]

(Id. at 94:2-7.) Counsel further outlined the harm that GeoDecisions will experience:

> If not enjoined, DTS will hire a dozen or more employees. . . . If these employees are allowed to go to DTS, they can build an entire practice, an entire business, shifting the entire competitive balance between two companies. In one quick swoop, almost all of the know-how and intellectual capital has been transferred from one company to another. GeoDecisions is devastated and may not be able to meet its contractual obligations. It will certainly be unable to expand its business as it intends in this plan.

> DTS, on the other hand, will step into its shoes and attempt to perform all the contracts and get the benefit of those, plus the relationships. How many future bids will be lost because this group can market itself as a package to governmental entities who are used to working with them already as a group? The potential harm is massive and just incalculable.

(Hearing Tr. at 12:6-25, 13:1-3.) As to irreparable harm, the Court finds this argument and the testimony of Mr. Pietropola to be convincing. The employees at issue had developed goodwill

---

[5] Mr. Pietropola also cited the fact that office space had been leased for six to eight people in an office in Austin, Texas, but now only two people were left to fill that office. (Hearing Tr. at 93:12-18.) This allegation is likely to have a determinable remedy in money damages and is therefore not an adequate basis for injunctive relief.

and business relationships on behalf of GeoDecisions. Their defection to DTS will significantly harm GeoDecisions in the market. GeoDecisions's current business relationships have been put into jeopardy, and its source of gaining future relationships will be significantly hindered. These are classic examples of irreparable injuries. Therefore, if the preliminary injunction is not entered, GeoDecisions will suffer irreparable injury in the loss of goodwill with its customers.

The Court finds DTS's argument to the contrary to be unconvincing and unsupported by the record or prevailing law. DTS asserts that the employees at issue all intended to leave GeoDecisions regardless of any opportunity with DTS, and therefore any injury is not the result of a breach by DTS of the non-disclosure agreement. (Doc. No. 13 at 13.) However, according to the evidence before the Court, the exit of the employees at issue was precipitated by DTS's hiring of Gurchiek and other GeoDecisions's employees. As GeoDecisions points out, "it was DTS'[s] breach that triggered the mass exodus." (Doc. No. 33 at 15.) Accordingly, the irreparable injury that GeoDecisions seeks to avoid is directly caused by the alleged breach of the non-disclosure agreement.

### C. Potential Harm to Defendant

Any potential harm to DTS is de minimis. Under the terms of the preliminary injunction, at worst DTS would be in the same position it was in during October 2010. The GeoDecisions employees at issue, per this Court's Temporary Restraining Order (Doc. Nos. 6, 27), have not performed any significant work-related tasks for DTS. The Court is unpersuaded by Mr. Ibaugh's concern that DTS's need to fill orders would be impaired by this preliminary injunction, given that DTS is still free to hire any individuals it wishes, other than those employed by GeoDecisions.

### D.    Public Interest

Finally, the Court concludes that "[t]he public interest is best served, in this case, by upholding the restrictive covenants freely entered into by [DTS]."  Nat'l Bus. Servs., 2 F. Supp. 2d at 709; see also First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc., 155 F. Supp. 2d 194, 230 (M.D. Pa. 2001) ("The public interest favors the enforcement of contracts.").  The Court is sympathetic, especially in these uncertain times, of the hardship that may be imposed on the GeoDecisions employees by virtue of a preliminary injunction prohibiting DTS from hiring them, particularly Ms. Gurchiek and Mr. Jay whom GeoDecisions has stated that it will not rehire.  (Doc. No. 14 at 20 n.3.)  Moreover, the Court notes that there is no evidence of record to suggest that these employees were aware that DTS was in breach of contract by extending employment offers to them.  Indeed they unwittingly placed themselves at the center of this dispute because neither party disclosed to them even the existence of the Agreement now at issue.  However, the Court agrees with the District Court for the Southern District of New York that parties cannot avoid their contractual obligations by asserting a claim of hardship on behalf of a non-party.  Global Telesystems, Inc. v. KPNQwest, N.V., 151 F. Supp. 2d 478, 484 n.1 (S.D.N.Y. 2001) (granting a preliminary injunction enforcing a no-hire agreement between KPNQ and GTS where an individual who was unaware of the no-hire agreement had resigned from GTS following an offer of employment with KPNQ ).  Further, although the immediate impact of an injunction will be visited upon these victim employees, the employees are free to seek employment at other firms, to seek reinstatement at GeoDecisions, or to seek legal redress from one of the parties now before the Court.

## IV.    CONCLUSION

Because the Court agrees with GeoDecisions that the no-hire provision is reasonably limited to protect legitimate business interests and ancillary to a valid contract, the Court concludes that it is enforceable. DTS's arguments regarding the enforceability of the agreement are unavailing. Because GeoDecisions has demonstrated a likelihood of success on the merits, a danger of irreparable harm in the absence of a preliminary injunction, and the balancing of harms tips in favor of enforcement of the provision, the Court will enter a preliminary injunction. An order consistent with this memorandum follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GEODECISIONS, a division of** | **:** | **No. 1:10-CV-2180** |
| **GANNETT FLEMING, INC.,** | **:** | |
| **Plaintiff,** | **:** | **(Chief Judge Kane)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **DATA TRANSFER SOLUTIONS, LLC,** | **:** | |
| **d/b/a DTS,** | **:** | |
| **Defendant** | **:** | |

## <u>ORDER</u>

**NOW**, on this 3rd day of December 2010, **IT IS HEREBY ORDERED THAT**

Plaintiff's motion for a preliminary injunction (Doc. No. 3) is **GRANTED**.  Defendant, its

officers, agents, servants, employees, attorneys, representatives and assigns, and all those acting

in concert with it, are hereby enjoined and restrained, pending further order of this Court, from

employing any person who worked for Plaintiff since May 28, 2010.


S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania